USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   8/1/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

TD AMERITRADE, INC.,                    :

                     Petitioner,    :

     -against-                    :

EDWARD W. KELLEY,                    :

                Respondent.    :

-----------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
PAUL A. CROTTY**

15cv714-PAC-FM

**FRANK MAAS,** United States Magistrate Judge.

I.    <u>Introduction</u>

        In this proceeding, petitioner TD Ameritrade, Inc. ("Ameritrade") has moved to vacate a Financial Industry Regulatory Authority ("FINRA") arbitral award ("Award") requiring it to deliver to respondent Edward W. Kelley ("Kelley") a physical share certificate for 152,380 Bancorp International Group, Inc. ("Bancorp") shares.  (<u>See</u> ECF No. 24).  Ameritrade argues that it cannot comply with the Award because that would require it either to do the impossible or to purchase and sell unregistered securities in violation of section 12(j) ("Section 12(j)") of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l(j).  (<u>See</u> ECF No. 51 ("Pet'r's Suppl. Mem.") at 13-22).

        Kelley has cross-moved for a "fairness hearing" pursuant to section 3(a)(10) ("Section 3(a)(10)") of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77c(a)(10).  (ECF No. 33).  Under Section 3(a)(10), the issuance of unregistered

securities is permitted in certain circumstances, including when a court competent to hear the matter has held a hearing and determined that the transaction is fair.

For the reasons set forth below, Ameritrade's motion to vacate the FINRA arbitral award, (ECF No. 24), should be granted in part, and Kelley's motion for a fairness hearing, (ECF No. 33), should be denied.

II.   Background

A.   Relevant Actors

Ameritrade is a securities "brokerage firm . . . [that] provides . . . services to self-directed investors."  (Ex. 4 at 3).[1]  Ameritrade does not purchase or sell securities; instead it provides a service to enable its customers to purchase securities from the "appropriate market."  (Id. at 3-4).

Kelley is a resident of South Carolina and an Ameritrade account holder. He opened an Ameritrade brokerage account in 2003.  (ECF No. 34 (Decl. of John P. Gleason, Esq., dated June 30, 2015 ("Gleason Decl.")), ¶¶ 2, 19).

Bancorp is a Nevada corporation.  In its 2005 annual report, Bancorp described itself variously as a "shell company," a "blank check company," "organized with no operations or plan of business," and as having only one full-time employee.  See http://www.sec.gov/Archives/edgar/data/1076779/000110465906042934/a06-14122_410 ksb.htm (last visited July 26, 2016).

---

[1]   "Ex." refers to the exhibits annexed to the Declaration of Miles D. Hart, Esq., dated June 10, 2015.  (ECF No. 30 ("Hart Decl."))

The Depository Trust Company ("DTC") is the "largest securities depository in the world."  (Ex. 1 at 14).  DTC is a subsidiary of the Depository Trust & Clearing Corporation and is a registered clearing agency with the United States Securities and Exchange Commission ("SEC").

See http://www.dtcc.com/about/businesses-and-subsidiaries/dtc.aspx (last visited July 26, 2016).  DTC functions somewhat like a bank, but rather than holding cash, keeps large quantities of securities safely in electronic form for brokers (such as Ameritrade) for the benefit of investors (such as Kelley).  See id.; (Ex. 1 at 14; Ex. 4 at 4-5).  In a typical securities transaction, an investor purchases a stock through a broker and "the stock is . . . electronically deposited with DTC," with neither the investor nor the broker receiving a physical stock certificate.  (See id.).  For investors who wish to obtain a physical stock certificate, DTC offers a "withdrawal[] service," which allows brokers to obtain physical stock certificates on behalf of investors.

See http://www.dtcc.com/matching-settlement-and-asset-services/securities-processing/withdrawals-service (last visited July 26, 2016).  At times, however, DTC may issue a "global lock" on a security, the effect of which is to "complete[ly] restrict[] . . . all DTC services for a particular security on deposit at DTC," including withdrawal services.  (Ex. 1 at 14-15).

B.   <u>Bancorp Common Stock</u>

In 2005, Bancorp apparently had one class of common stock bearing "CUSIP N[umber] 05968X106" ("X106 Shares").[2]  (<u>See</u> Ex. 4 at 78).  On August 1, 2005, Bancorp issued a press release informing its shareholders that the "company ha[d] been the victim of corporate identity fraud . . . [and that the] individuals . . . involved . . . printed invalid share certificates."  (<u>Id.</u> at 72).  Following this announcement, on August 11, 2005, DTC placed a global lock on the trading of all X106 Shares in its custody.  (<u>Id.</u> at 83).  The global lock remains in effect today.  (<u>Id.</u> at 99).  A few weeks later, on August 31, 2005, the SEC also temporarily suspended the trading of X106 Shares until September 14, 2005.  (<u>Id.</u> at 85).

In 2006, in connection with the settlement of a lawsuit in Oklahoma, Bancorp issued new shares under CUSIP Number 05968X205 ("X205 Shares").  (Ex. 1 at 18-25).  Pursuant to the settlement agreement, these shares were exempt from registration under Section 3(a)(10).  (<u>Id.</u>).

On November 3, 2009, based on Bancorp's failure to comply with the reporting requirements of the Exchange Act, the SEC "revok[ed] the registration of each class of registered securities of [Bancorp]" pursuant to Section 12(j).  (Ex. 4 at 91-92).  This thus revoked the registration of both the X106 and X205 Shares.  (<u>See</u> Ex. 35 at 1 (Bancorp's 2007 Annual Report) (noting that Bancorp's common stock was registered

---

[2]   "CUSIP numbers consist of nine characters . . . that uniquely identify a company or issuer and the type of financial instrument."  <u>See</u> https://www.sec.gov/answers/cusip.htm (last visited July 26, 2016).

under the Exchange Act)).  The SEC's revocation remains in effect today.[3]  See

https://www.sec.gov/cgi-bin/browse-edgar?company=Energy+Source&owner=exclude&

action=getcompany (last visited July 26, 2016).

      C.     Kelley's Claim and FINRA Arbitration

On August 18, 2005, with Ameritrade acting as his broker and despite

DTC's global lock, Kelley purchased 152,380 X106 Shares at a price of $.01050 per

share.  (See Ex. 4 at 78).  In 2012, seven years after the purchase, Kelley emailed

Ameritrade a request that it deliver to him a physical certificate for these shares.  (Ex. 1 at

11-12).  On August 10, 2012, Ameritrade replied to Kelley's email, informing him that

because his shares were on deposit with DTC, which had imposed a global lock, it was

"unable to facilitate client requests for stock certificates of [Bancorp]."  (Id.).

On May 6, 2014, Kelley initiated a FINRA arbitration proceeding in an

effort to compel Ameritrade to comply with his request.[4]  (Exs. 1-2).  Because FINRA

concluded the matter was suitable for "simplified" arbitration, it was decided by arbitrator

Karla Y. Vogel solely on the basis of written submissions.  (Hart Decl. ¶¶ 10-11; Ex. 3).

---

[3]      Kelley disputes the applicability of the SEC's revocation to Bancorp common stock.  (See, e.g., ECF No. 50 ("Resp't's Suppl. Mem.") at 7).  He apparently relies on the fact that the revocation order produced by Ameritrade refers to a company by the name "Energy Source, Inc."  (See Ex. 4 at 91-92).  Nevertheless, it is evident that the revocation relates to Bancorp.  (See id. ("The Commission approved a ten-day temporary suspension of Energy Source's (then known as Bancorp . . . ) common stock on August 30, 2005.")).  Kelley's contention to the contrary consequently is meritless.

[4]      According to Ameritrade, "shareholders of [Bancorp] have filed at least 56 separate FINRA arbitration cases against brokers seeking delivery of certificates for shares of [Bancorp] stock."  (ECF No. 25 at 19; see also Ex. 33).

On December 12, 2014, Ms. Vogel found in favor of Kelley, ordering Ameritrade, <u>inter</u> <u>alia</u>, to "deliver to [Kelley] a physical share certificate for 152,380 of [Bancorp] shares."[5] (Ex. 22 at 7-8). Thereafter, on January 2, 2015, by letter application, Ameritrade requested that Ms. Vogel clarify whether Ameritrade was required to deliver to Kelley X106 or X205 Shares. (<u>Id.</u> at 1-3). On January 22, 2015, Ms. Vogel denied that request. (Ex. 23).

      D.     <u>Relevant Procedural History</u>

          1.     <u>Original Motions and the Arizona Action</u>

      On June 11, 2015, Ameritrade moved to vacate the Award, arguing that it would be either impossible or illegal for it to carry it out. (<u>See</u> ECF No. 24). On July 2, 2015, Kelley cross-moved for a "fairness hearing" pursuant to Section 3(a)(10), seeking this Court's approval of the issuance of new Bancorp shares exempt from registration under the Securities Act. (ECF No. 33).

      While the Ameritrade and Kelley motions were pending, a proceeding nearly identical to this one, <u>Haviland v. TD Ameritrade, Inc.</u>, 15cv611 ("<u>Haviland</u>"), was ongoing in the United States District Court for the District of Arizona. There, Ameritrade had moved to vacate a FINRA arbitral award requiring it to deliver Bancorp shares to petitioner Douglas A. Haviland ("Haviland"). On June 25, 2015, Judge Neil V. Wake issued a decision, in which he concluded that it was impossible and illegal to deliver the

---

     [5]     Ms. Vogel also awarded Kelley $1,610.98. (<u>Id.</u>). Ameritrade does not contest that portion of the Award, which has already been paid. (Hart Decl. ¶ 20).

shares to Haviland.  For that reason, Judge Wake confirmed the arbitral award "only to the extent that . . . Ameritrade must continue to make good faith efforts to transfer" the Bancorp stock to Haviland.  Haviland, 2015 WL 3907117, at *5 (D. Ariz. June 25, 2015) ("Haviland I").

On July 8, 2015, Haviland moved for reconsideration of Haviland I. (Haviland, ECF No. 31).  In his motion, Haviland argued for the first time that Ameritrade could comply because the X205 Shares were exempt from SEC registration under Section 3(a)(10).  (See id., ECF No. 31-2 at 25-41).  As a consequence, on August 10, 2015, Judge Wake issued a decision in which he vacated Haviland I and confirmed the arbitral award based on Ameritrade's ability to make a lawful purchase of the X205 Shares.  See Haviland, 2015 WL 4745269, at *1 (D. Ariz. Aug. 10, 2015) ("Haviland II").

On August 19, 2015, Ameritrade moved for reconsideration of Haviland II, arguing that the act of delivering the X205 Shares to Haviland also would be illegal.  (See Haviland, ECF No. 46).  Finally, on February 12, 2016, Judge Wake reinstated Haviland I.  (Haviland, ECF No. 64 ("Haviland III")).  In reaching his decision, Judge Wake determined that (a) it was an abuse of discretion for him to have allowed Haviland to file his original motion for reconsideration, and (b) the arbitral award did, in fact, require Ameritrade to perform either an illegal or impossible act.[6]  (Haviland III at 2).

---

[6]   Judge Wake explained that he considered Haviland's motion for reconsideration out of "an excess of latitude" because Haviland was proceeding pro se.  (Id. at 1).

2.      Supplemental Briefing

On February 5, 2016, prior to the issuance of Haviland III, I issued a Report

and Recommendation urging that Ameritrade and Kelley's cross motions be denied

without prejudice, with further briefing to follow Judge Wake's decision in Haviland III.

(See ECF No. 42 ("R&R")).  Before Your Honor could consider the R&R, Judge Wake

decided Haviland III.  Accordingly, by Memorandum and Order dated February 23, 2016,

Your Honor vacated my R&R, terminated the cross motions, and returned the case to me

for further proceedings.  (See ECF No. 44).  I then directed the parties to file

simultaneous supplemental briefs and allowed them to file supplemental replies.

(See ECF Nos. 45, 53).  On April 20, 2016, both parties submitted their supplemental

briefs.  (See Pet'r's Suppl. Mem.; Resp't's Suppl. Mem.).  On May 9 and 10, 2016,

respectively, Kelley and Ameritrade submitted their supplemental replies.  (ECF Nos. 57

("Resp't's Suppl. Reply"), 58).  The motions consequently are fully submitted.

III.    Standard of Review

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., a court

reviewing an arbitral award "can confirm and/or vacate the award, either in whole or in

part."  Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co., 668 F.3d 60,

71 (2d Cir. 2012) (quoting D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 104 (2d

Cir.2006)).  Nevertheless, a court's review of an arbitral award is "very narrowly

limited."  Belesis v. Lowery, No. 15 Civ. 2633 (JSR), 2015 WL 4563306, at *1 (S.D.N.Y.

July 20, 2015) (quoting Diapulse Corp. of Am. v. Carba, Ltd., 626 F.2d 1108, 1110 (2d

Cir. 1980)); see also Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC, 497 F.3d 133, 138 (2d Cir. 2007) ("This Court has repeatedly recognized the strong deference appropriately due arbitral awards."). Thus, the FAA permits the vacatur of an arbitral award only:

> [(A)] where the award was procured by corruption, fraud, or undue means; [(B)] where there was evident partiality or corruption in the arbitrators . . . ; [(C)] where the arbitrators were guilty of misconduct . . . ; or [(D)] where the arbitrators exceeded their powers . . . .

9 U.S.C. § 10.

In addition to these statutory justifications, the Second Circuit has held that an arbitral award "may be set aside if it compels the violation of law." Diapulse Corp., 626 F.2d at 1110. Moreover, a court may vacate an arbitral award where it mandates that a party perform an impossible act. See Haviland I, 2015 WL 3907117, at *4; see also Edge Grp. WAICCS LLC v. Sapir Grp. LLC, 705 F. Supp. 2d 304, 319 (S.D.N.Y. 2010) (citing Restatement (Second) of Contracts § 357) ("[I]f a party cannot perform at the time of the application for specific performance, that fact will preclude the grant of specific performance.").

IV.     Discussion

There are three means by which Ameritrade potentially could comply with the Award. Ameritrade could conceivably (A) purchase Bancorp common stock in the open market on Kelley's behalf, (B) transfer to Kelley the physical stock certificate for his X106 Shares, or (C) request that Bancorp issue new shares of common stock.

Ameritrade argues that each of these alternatives is either illegal or impossible.  (See Pet'r's Suppl. Mem. at 13-22).

      A.    <u>Bancorp Stock Available in the Market</u>

Bancorp shares are available for purchase by private individuals.  Indeed, Sperry Younger, the managing director of an investment banking firm, has offered to sell Ameritrade Bancorp shares for $1.25 a share.  (<u>See</u> Ex. 19 at 5; Ex. 25).  Nevertheless, Ameritrade maintains that the Exchange Act precludes it from purchasing Bancorp shares because it is a broker and the SEC has revoked the registration of all Bancorp shares. (Pet'r's Suppl. Mem. at 16-17).[7]

Under Section 12(j), a broker, such as Ameritrade, is prohibited from "effect[ing] any transaction in, or . . . induc[ing] the purchase or sale of, any security the registration of which has been and is suspended or revoked" by the SEC.  <u>See</u> 15 U.S.C. § 78l(j).  Section 12(j), by its terms, thus makes it illegal for Ameritrade to either purchase shares of Bancorp for Kelley or provide Kelley money so that he may effect a purchase.

The fact that the X205 Shares are exempt from registration under Section 3(a)(10) of the Securities Act does not alter this conclusion.  Although Kelley in effect

---

[7]    Kelley argues that Ameritrade could and should have furnished the stock certificate to him prior to the SEC's revocation order.  (Resp't's Suppl. Reply. at 7).  Although Ameritrade could have obtained Kelley's stock certificate at an earlier date, that is irrelevant here.  Ameritrade was under no obligation to deliver the physical stock certificate to Kelley until he made that request, which he did not do until years after the SEC's order went into effect.  (Ex. 1 at 11-12).

argues that a security exempt from registration under the Securities Act is also exempt under the Exchange Act (and thus not impacted by an SEC revocation order), this is not the case.  As Ameritrade correctly observes, the Exchange Act and the Securities Act "are separate statutes with different purposes."  (Pet'r's Suppl. Mem. at 18-19).  "[T]he [Exchange] Act . . . is . . . chiefly concerned with the regulation of post-distribution trading."  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 752 (1975) (emphasis added).  On the other hand, "[t]he [Securities] Act is a far narrower statute chiefly concerned . . . with [initial] offerings of securities."  Id.  Accordingly, a security may be exempt from registration under the Securities Act at the initial offering stage but may still need to comply with the Exchange Act's "post-distribution trading" requirements.  Indeed, Section 3(a)(10) "operate[s] more like [a] transaction[al] exemption[]" from registration during the initial issuance of a security.  See Thomas Lee Hazen, Federal Securities Law 42 (3d ed. 2011).  Accordingly, "absent another exemption, all later transactions . . . of these securities by persons having acquired them under this exemption must be registered."  Id.; see also Leoni v. Rogers, 719 F. Supp. 555, 564 (E.D. Mich. 1989) (quoting SEC, Notice of Adoption of Rule 147, Release No. 5450 (Jan. 7, 1974)) (noting that another exemption to registration under the Securities Act does not "provide[] an exemption from the . . . periodic reporting provisions . . . of the Exchange Act").

In sum, Section 12(j) prohibits Ameritrade from purchasing Bancorp shares in the marketplace.  Consequently, the Award should be vacated to the extent it requires

Ameritrade to engage in "any transaction" for existing Bancorp common stock so long as the SEC's revocation order remains in effect.  See Diapulse Corp., 626 F.2d at 1110.

      B.     Kelley's X106 Shares

           To comply with the Award, Ameritrade could conceivably also transfer to Kelley the physical stock certificate for his X106 Shares.  This transfer presumably would not violate the Exchange Act because it would not require Ameritrade to engage in a "transaction" for shares whose registration has been revoked.  See 15 U.S.C. § 78l(j). Instead, it would simply change the form in which those specific shares were held. Ameritrade, nevertheless, maintains that it is impossible to provide Kelley the physical stock certificate so long as DTC's global lock on Bancorp shares remains in place. (Pet'r's Suppl. Mem. at 13-14).

           As noted above, when DTC places a "global lock" on a security, it "complete[ly] restrict[s] . . . all DTC services for [that] security on deposit at DTC."  (Ex. 1 at 14-15).  If Kelley's stock is subject to the global lock, it consequently would be impossible at this time to obtain the physical stock certificate.  (See id.; Ex. 4 at 99); see also Haviland I, 2015 WL 3907117, at *4 ("Ameritrade has no power to force such a transfer.").  Kelley maintains, however, that his shares could never have been in DTC's custody because he purchased them after the global lock was in place.  (Resp't's Suppl. Mem. at 8).  As Kelley correctly observes, (id.), this also distinguishes his case from the Arizona action, because Haviland purchased his shares before the global lock took effect, see Haviland I, 2015 WL 3907117, at *1.  Although Kelley is correct that he purchased

12

his shares after DTC's global lock went into effect, (see Ex. 4 at 78, 83), his assertion that his shares therefore are not held by DTC does not withstand scrutiny.

As Ameritrade has explained, it was able to purchase shares of Bancorp on Kelley's behalf despite the global lock through a continuous net settlement ("CNS") transaction.  (See Tr. of May 18, 2016 Telephone Conference at 4).[8]  In a CNS transaction, one broker purchases shares of a stock held by another broker, but the total number of shares in DTC's custody remains constant.

See http://www.dtcc.com/clearing-services/equities-clearing-services/cns (last visited July 26, 2016).  Such a transaction, by definition, does not require DTC to take custody of new Bancorp shares.  Moreover, Kelley has not adduced any evidence that a CNS transaction was prohibited by the global lock.  (See Resp't's Suppl. Mem.; Resp't's Suppl. Reply).  There consequently is no basis for Kelley's objection that his purchase must have involved a physical share certificate that Ameritrade held.

Indeed, all of the surrounding circumstances suggest that Kelley's purchase involved an electronic – not a paper – transaction.  First, Ameritrade has provided documentation of the settlement of Kelley's purchase of X106 Shares.  (Ex. 4 at 78).  Second, under FINRA Rule 11310, Ameritrade is required to "use . . . a securities depository for the book-entry settlement of all transactions in depository eligible securities."  FINRA Rule 11310 (emphasis added).  Kelley does not dispute that Rule 11310 applied to his transaction, (see Resp't's Suppl. Mem.; Resp't's Suppl. Reply), and,

---

[8]        I have forwarded a copy of the transcript to Your Honor's chambers.

13

as noted above, DTC is the "largest securities depository in the world."  Third,

Ameritrade has produced evidence that DTC holds approximately 117 million X106

Shares on its behalf.  (Ex. 4 at 99).  Given this volume of shares, there is no reason to

believe that Kelley's X106 Shares are not among these holdings, especially in light of the

FINRA rule.  Finally, transferring to Kelley a physical stock certificate for his X106

Shares would be relatively simple and inexpensive, as it would not require Ameritrade to

purchase new Bancorp shares at a cost of as much as $1.25 a share.  Accordingly, it

would be in Ameritrade's interest to make such a transfer if it were able to do so.

   In short, all of the evidence virtually compels the conclusion that Kelley's

shares are, in fact, held at DTC and subject to its global lock, as Ameritrade has

consistently maintained.  (Ex. 1 at 11-12).  Accordingly, because "Ameritrade has no

power to force" DTC to provide the physical share certificate for any Bancorp stock in its

custody, it is impossible for Ameritrade to transfer to Kelley the physical stock certificate

for his X106 Shares.  See Haviland I, 2015 WL 3907117, at *4.

   C. Issuance of New Shares

   The third potential method by which Ameritrade could obtain shares of

Bancorp for Kelley would be to have Bancorp issue new shares.  Likely recognizing that

Bancorp could not comply with the registration requirements of the Securities Act, Kelley

has suggested that Ameritrade purchase from Bancorp newly-issued shares exempt from

Securities Act registration under Section 3(a)(10).  In furtherance of that goal, Kelley has

14

moved for a hearing at which this Court could make the fairness determination required by that exemption.  (ECF No. 33).

As noted previously, under Section 3(a)(10), the issuance of an unregistered security is permitted when a court competent to hear the matter has held a "hearing upon the fairness" of the transaction and finds the transaction to be fair.  See 15 U.S.C. § 77c(a)(10).  In addition to the hearing requirement, to qualify for the exemption, the security must be issued "in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash."  See id. Significantly, the securities "cannot be offered [only] for cash."  (Gleason Decl., Ex. A (SEC Legal Bulletin on Section 3(a)(10)) at 1).

There are myriad procedural issues with Kelley's motion for a fairness hearing.  By way of example, Section 3(a)(10) contemplates that the issuer – here, Bancorp – will seek a fairness hearing so that it might issue unregistered shares.  (See id. ("Before the issuer can rely on the exemption, the following conditions must be met.") (emphasis added)).  Bancorp, however, is not a party to this matter.  Accordingly, it is not clear whether Bancorp would agree to issue exempt shares or what the terms of such an issuance would be.  (See id. (The reviewing court "must have sufficient information before it to determine the value of . . . the securities to be issued in the proposed transaction.") (citation and internal quotation marks omitted)).[9]

---

[9]      Nor is it even evident that this Court has jurisdiction to consider the cross-motion. When parties to an agreement seek judicial enforcement of an arbitral award, a federal court may enter an order confirming the arbitrator's decision, "unless the award is vacated, modified, or

The Court need not determine if such procedural issues can be overcome, however, because Section 3(a)(10) is plainly inapplicable here.  Critically, the "exchange" Kelley proposes would result in a cash-only transaction.  Indeed, the Court cannot conceive of any way that Ameritrade could induce Bancorp to issue new shares other than by paying Kelley or Bancorp directly for their issuance.

In an effort to avoid this conclusion, Kelley contends that Ameritrade could fashion "an agreement that looks substantially like a convertible promissory note with takedowns of the debt by the creditor priced at a discount to market and subject to an ownership limitation to avoid affiliation."  (ECF No. 35 at 13).  As Ameritrade correctly observes, (ECF No. 36 at 8), this language is taken verbatim, without attribution, from a securities law blog, see http://securities-law-blog.com/2014/08/05/sale-unregistered-securities-must-satisfy-form-8-k-filing-requirements-3a10-transaction-know/ (last visited July 26, 2016).  The relevant portion of the blog post describes a method by which a company can pay off pre-existing debt obligations, such as unpaid "expenses incurred in the company's operations," by issuing the creditor common stock.  See id.  Even if that approach is appropriate in some contexts, it plainly is inapplicable here where no such pre-existing debt obligation exists.  Nor should the Court give its imprimatur to a scheme conceived solely to avoid the

---

corrected as prescribed in sections 10 and 11 of [the FAA]."  9 U.S.C. § 9.  Suffice it to say, noting in the FAA contemplates the Court holding a fairness hearing under Section 3(a)(10).

dictates of Section 3(a)(10), knowing full well that the underlying transaction was a cash transfer.

Accordingly, it also would be impossible for Ameritrade to induce Bancorp to issue shares exempt from registration under Section 3(a)(10) so that they can be delivered to Kelley.

V.    Conclusion

For the foregoing reasons, Ameritrade's motion to vacate the FINRA arbitral award, (ECF No. 24), should be granted in part.  As Judge Wake held in Haviland I, Ameritrade should be required to continue to make good-faith efforts to comply with the Award by transferring to Kelley a stock certificate recognizing his ownership of 152,380 Bancorp shares.  Stated somewhat differently, Ameritrade should comply with the Award when and if it becomes legal and possible to do so.  Kelley's cross-motion for a fairness hearing, (ECF No. 33), should be denied.

VI.   Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, to my chambers at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

17

Any requests for an extension of time for filing objections must be directed to Judge

Crotty.  The failure to file timely objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72(b).

        SO ORDERED.

Dated:     New York, New York
           August 1, 2016

                                               FRANK MAAS
                         United States Magistrate Judge

Copies to all counsel via ECF